**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| BRANCH BANKING & TRUST COMPANY, as successor in interest to Colonial Bank by asset acquisition from the FDIC as receiver for Colonial Bank, | ) ) ) ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 10-00267-CB-M |
| | ) |
| HOUMA DOLLAR PARTNERS, L.L.C., CHARLES W. REEVES, JR., SUZANNE REEVES, REEVES DEVELOPMENT, L.L.C. | ) ) ) |
| Defendants. | ) |

**OPINION and ORDER**

This matter is before the Court on a Motion for Summary Judgment filed by the Plaintiff, Branch Banking & Trust Company (BB&T). (Doc. 63.) This action arises from a series of loan transactions between the defendants and Colonial Bank and Colonial's successor-in-interest, BB&T.  BB&T seeks to recover the balance due on commercial loans made to defendant Houma Dollar Partners, LLC and guaranteed by defendants Charles Reeves, Suzanne Reeves and Reeves Development, LLC.  BB&T also seeks to recover on a personal loan to Charles and Suzanne Reeves. Defendants have raised affirmative defenses to BB&T's claims and have also asserted counterclaims against BB&T.  BB&T has filed a motion seeking summary judgment its favor on all claims and counterclaims.   Defendants have filed a response opposing summary judgment on most, but not all, claims and counterclaims.  After considering the evidence presented in the light most favorable to the Defendants, the Court finds that BB&T's motion is due to be granted in its entirety.

1

## I. FINDINGS OF FACT

### A. The Parties

BB&T is a banking organization with its principal place of business in Winston-Salem, North Carolina.  On or about August 14, 2009, BB&T acquired the assets of Colonial Bank from the Federal Deposit Insurance Corporation (FDIC) as part of a purchase and assumption agreement following the FDIC's takeover of Colonial.  Among the assets acquired were the obligations of defendant Houma Dollar Partners and its guarantors, Charles Reeves, Suzanne Reeves and Reeves Development Company, LLC.

Houma Dollar Partners, LLC (Houma) and Reeves Development Company, LLC (Reeves Development) are limited liability companies organized and existing in the State of Louisiana. Charles Reeves and Suzanne Reeves, both Louisiana citizens, are the only members of Houma Dollar and Reeves Development.[1]  The commercial loans at issue in this case originated between the Defendants and Colonial Bank in Foley, Alabama.

### B. The Guidance Line Loan Agreement:  Colonial Provides Houma $10 Million Line of Credit Guaranteed by the Reeves and Reeves Development

When Houma and Colonial began transacting business in 2006, Houma was in the business of developing Dollar General stores throughout the United States.  Dollar General, Inc. would identify a new location for one of its stores and enter into a lease agreement with Houma. Houma would purchase the land, build the store (using Reeves Development as the contractor), and sell the already-leased store to investors.  Houma financed each of these projects.  In 2006,

---

[1] For ease of reference, in this Order Charles Reeves (the managing member of Houma and Reeves Development) is referred to as "Reeves",  Charles and Suzanne Reeves are collectively "the Reeves",  Charles and Suzanne Reeves plus Reeves Development are (when relevant) collectively "the Guarantors" and, of course, the term "Defendants" refers to all four defendants.

Houma decided to consolidate financing for all projects with one lender, rather than using various lenders as it had in the past.  Houma chose Colonial Bank as its lender.

In 2006, Houma and Colonial entered into a one-year Guidance Line Loan Agreement (GLA), which gave Houma a maximum line of credit of $10 million dollars to acquire real property and fund construction of retail stores.  At the same time, Houma and Colonial entered into a Master Construction Loan Advance Agreement (MCLAA), which set out the conditions for disbursing funds.  Both agreements were amended and renewed twice—first for a period of one year, then for a period of six months—with generally the same terms as the original agreements.  The Second (and final) Amended GLA and MCLAA were signed on April 2, 2009.  Each GLA and MCLAA was executed by Houma, as borrower, and by Charles Reeves, Suzanne Reeves and Reeves Development, as Guarantors.  In addition, the Guarantors each signed separate guaranty agreements covering all obligations of Houma to Colonial.  By their terms, these guaranty agreements covered future loans and continued in effect until revoked in writing.

Under the GLA's, the property acquisition and construction for each location was considered to be a separate "Project".  For each Project, Houma and Colonial agreed on a budget in advance, Colonial would loan up to a predetermined amount, and Houma would sign a closed-end promissory note ("Note") payable in one year if no demand was made before then.  Interest was payable monthly.  Construction was to begin within 120 days of execution and be completed by the maturity date.

The loan documents contained cross-default provisions, that is, default on one Note would put all Notes in default.  They also contained cross-collateralization provisions, with each ongoing Project serving as collateral for other ongoing Projects.   Unless there was a default, a Project would be released once the Note for that Project was paid off. Although the Second

Amended GLA expired on September 17, 2009, its terms continued to govern each Project and

Note and all Advances made prior to the expiration.  Among the events of default the Second

Amended GLA were the following:

> C)      default in the payment of the principal or any interest or cost of the Loan,
> any Note or any of the other obligations of the Borrower to Lender, as and when
> due and payable; . . .

> L)      the occurrence of such a material change or such a combination of
> otherwise immaterial changes in the condition or affairs (financial or otherwise)
> of the Borrower or Guarantor as in the sole opinion of Lender, impairs Lender's
> security or increases its risk; . . .

> N)      the occurrence of any default or event of default under any other security
> document or loan document between Borrower and Lender. . .

(Pl.'s Ex. 3, Doc. 63, § 6.01.)

The Second Amended GLA could be modified or amended *only* in writing. (*Id.* § 8.09.)

"This Agreement … may not be modified or amended except by a written agreement executed

by the Borrower and Lender."  (*Id.* § 8.09.)  Similarly, "[n]o modification amendment or waiver

of any provision of this Agreement, the Note or other Loan Documents nor consent to any

departure therefrom by the Borrower shall be effective unless the same shall be in writing and

signed by the Lender."  (*Id.* § 8.06.)  Furthermore, "[n]either any failure nor any delay on the

part of [the] Lender in exercising any right" under the Agreement, any Note or other loan

documents, nor any course of dealing between the parties … shall operate as a waiver thereof."

(*Id.* § 8.05.)

In conjunction with the Second Amended GLA, Charles Reeves, Suzanne Reeves and

Reeves Development signed a Continuing Guaranty Agreement guaranteeing the $10 million

dollar credit, any future extensions of credit and any renewals or extensions.  The Continuing

Guaranty Agreement continued in full force and effect until such time as it was revoked in

writing.  The guarantors expressly waived "any right to notice whatsoever, including any notice

with regard to the creation, extension, or renewal of this indebtedness or … notice of the

Debtor's default or failure of performance." (Pl.'s Ex. 32 , Doc. 63.)

### C.  The Promissory Notes and Acknowledgements

BB&T seeks to recover on unpaid promissory Notes for seven Projects.  Of those, two

were in Indiana—Gary and Hobart—and five were in Texas—Ozona, Ranger, Maypearl, Austin

(Ross Road) and Shallowater.  Some of these original Notes were renewed and extended.  The

Notes, including renewals and extensions, are collectively referred to as "the Houma Notes".

The original date of execution for each Note as well as the latest maturity date are listed

below:

| Project | Execution | Maturity |
|---|---|---|
| Austin | May 14, 2008 | March 25, 2010 (after extensions) |
| Gary | June 25, 2008 | March 31, 2010 (after extensions) |
| Hobart | July 14, 2008 | March 31, 2010 (after extensions) |
| Maypearl | Dec. 10, 2008 | Dec. 10, 2009 |
| Ozona | May 26, 2009 | May 26, 2010 |
| Ranger | June 19, 2009 | June 19, 2010 |
| Shallowater | Aug. 18, 2009 | Aug. 18, 2010 |

The Notes were payable on demand or upon an event of default.  Among the events of default

listed in each Note were (1) failure to pay the Note at maturity and (2) a default by Houma on

any other loan between Houma and the bank.[2]

Each time a note was signed or extended Charles Reeves (both individually and on behalf

of Houma) and Suzanne Reeves signed an "Acknowledgement of Balloon Payment" which

stated:

The undersigned acknowledge we have entered into a mortgage loan . . . which
will result in our owing a single, large "BALLOON" payment at maturity.  We

---

[2] As noted above, *supra* at 3, the Second Amended GLA also listed several events of default.

5

> acknowledge and agree [that the lender] is not obligated to refinance the "BALLOON" payment.  [The lender] will make a decision whether to refinance the "BALLOON" payment at maturity, and we agree to be bound by and accept the decision.

(Pl.'s Exs. 10, 14, 16, 20, 24, 26, 28, 31, Doc. 63.)

### D.  Questions About Colonial's Financial Stability

In December 2008, Colonial announced that it had received funds from the United States government's Troubled Asset Relief Program (TARP). Reeves understood that the bank was in a distressed financial condition but believed that the TARP funds would stabilize it.  However, Reeves subsequently learned that the TARP funds were conditioned on Colonial raising another $300 million in capital.  In late January 2009, Reeves spoke with Nelson who told him that Colonial's management was stating that Colonial had multiple sources from which to raise the capital.  Reeves claims that as a result of this statement he chose not to seek alternative funding for his business and continued to borrow against the Colonial line of credit.

### E.  Credit Dries Up as Colonial Collapses, FDIC Steps In & BB&T Takes Over

Up through early 2009, the Houma loans had been performing well.  Therefore, Charles Reeves was surprised in March 2009 when Colonial's loan committee rejected Houma's request to renew the GLA for another one-year term.  The loan committee informed Reeves that Colonial no longer wanted to be involved with commercial construction loans.  Colonial did agree to renew the GLA for six months, but with instructions that the line of credit would cease at the end of the period and no new loans would be made.  The renewal allowed funding for Projects already underway (some of which were in the early stages), but the goal was to get Colonial out of the credit by the first quarter of 2010.  Even though each promissory note was for a one-year term, Reeves had repeatedly discussed with Sam Nelson, Houma's Colonial loan officer, what would happen with Projects that were not yet complete when the loan period expired.  Nelson's

6

response was "that reasonable prudence was – or a reasonable standard would be that the lender would renew that promissory note for the period of time to get through the interim construction period."  (Reeves Dep. 204, Defs.' Ex. 2, Doc. 70.)

Beginning in mid-2009, the loan renewal process became slower, causing delays in construction.  On May 9, 2009, the FDIC issued a cease and desist order (CDO) prohibiting Colonial from making loans.  In the summer of 2009, Colonial continued to renew Houma's notes for ongoing Projects, albeit slowly.  On August 14, 2009, Colonial went into receivership and its assets were acquired by BB&T.  The Second Amended GLA expired in early October 2009.  By the last quarter of 2009, Houma was experiencing difficulties due to funding delays and impending winter weather.  Reeves began negotiating a workout with BB&T to allow funding for completion of Projects underway.

### F.  Draw Requests

Proceeds of each Note were disbursed in stages or "draws" according to the terms of the Second Amended GLA.  The process included invoices, affidavits, inspections and reports. Once Colonial received all the required paperwork, a construction loan officer would review the information.  Colonial would then wire to Houma's account as much of the requested amount as was supported by the documents.  All draw requests made after May 9, 2009 (the date of the CDO), were processed and paid in a timely manner.  Some requests were partially rejected, but those rejections were  based on independent inspections and were in compliance with the loan documents.

### G.  Troubles with the Austin, Gary & Hobart Loan Renewals

Three loans that originated in the spring and summer of 2008 matured during the summer of 2009—Austin, Gary and Hobart.  The Gary loan matured on June 25, 2009 and was renewed

on July 29, 2009.  The Hobart loan matured on July 14, 2009.  The Austin loan originally

matured on May 14, 2009 and was renewed to July 14, 2009.  On July 29, 2009, all three loans

were renewed until September 17, 2009.  According to Charles Reeves, Colonial delayed in

"booking" these loans. Presumably, the funds were not available for draws during this delay.[3]

Time was of the essence with respect to the Hobart project because it involved a store relocation.

Dollar General's existing lease was expiring, and the store had to be ready by February 2010.  In

August 2009, Dollar General canceled the Hobart contract.  According to Charles Reeves, this

cancellation was "[d]ue in part to the delays in the booking process for the Hobart draws"

because Houma was unable "to produce proof of funding capability demonstrating its ability to

complete the project."  (C. Reeves Decl. ¶ 24, Doc. 70-1.)

By the time the Austin, Gary and Hobart notes came due in September, BB&T had taken

over.  Reeves informed Nelson, who continued to be the Houma loan officer, that the Hobart

lease has been cancelled.  Reeves also told Nelson that all three loans needed to be extended to

prevent potential defaults on Hobart and Austin from affecting completion of the Gary Project.

On October 2, 2009, the loan committee approved these loan extension through March 31, 2010.

The Gary and Hobart loans were processed on October 14, 2009.  The Austin loan was not

processed until November 18, 2009.

Even though the Gary loan was processed and funds were available, Reeves was uneasy

about beginning construction on the Gary store until the Austin loan was processed.  Therefore,

Houma did not begin construction of the Gary store until October 20, 2009 and proceeded slowly

until the Austin renewal was complete.  This delay prevented Houma from completing the Gary

---

[3] The Defendants do not explain what they mean by "booking" loans, nor do they provide any specifics regarding the length of delay.  Moreover, they do not point to any obligation Colonial may have had to "book" loans within a specific time frame.

store before winter weather set in.  That meant that Gary would not be complete before the note

matured.  Consequently, Houma faced the real possibility of default on all three notes.

### H.  Houma & BB&T Negotiate an Exit Strategy; Waco Proceeds Escrowed

In December 2009, Reeves submitted a workout plan to BB&T that would fund

completion of the remaining Projects.  As part of that plan, Reeves wanted compensation "for

funds lost as a result of the previous months of issues."  (Reeves Decl. ¶ 29.)   Reeves informed

Houma's new loan officer, Emily Miles, that Houma would not go forward with the impending

sale of a store in Waco, Texas if the parties could not reach an agreement on the workout plan by

the end of the year.  Miles asked Reeves to get an extension on the Waco sale to give BB&T

time to approve the plan, but the buyer could not agree.  Reeves suggested to Miles that "if she

could obtain a commitment to move forward judiciously and seek approval for the proposed

workout, [Reeves] would allow the Waco sale to go forward with the cash escrowed in lieu of a

loan payoff to allow funds for the cash portion of the workout agreement."  (Reeves Decl. ¶34.)

The Waco sale went forward, and the funds were escrowed by agreement.

The written escrow agreement, signed by Reeves, states:

> <u>Disbursement of Deposit</u>.  Escrow Agent is hereby authorized to deliver funds in
> the amount of the full principal and interest due, not to exceed the amount of
> escrowed funds $963,003.21, to "Bank", upon presentation to the Escrow Agent
> of written demand from "Bank".  It will be the "Banks" [sic] discretion that if and
> only if the "Bank" consents, a lesser amount may be required.  If no decision is
> made prior to 02/04/2010, then the full amount of the escrow will be wired to the
> "Bank" and a release will be issued.

(Pl.'s Exs. 154-A & 154-B.)[4]

---

[4] Reeves signed two copies of the escrow agreement.  The only difference in the two is
the identity of the escrow agent.  Both contain the disbursement language quoted above.

Reeves submitted a final workout proposal to Miles on January 13, 2010.  Some issues remained to be worked out regarding some of the notes.  A February 17, 2010 e-mail from Miles to Reeves indicated that the renewal package was almost ready to go before the loan committee.

### I. No Workout Agreement, BB&T Demands Payment on All Loans, Refuses to Provide Payoff Amount for Shallowater Sale

On March 11, Reeves emailed Miles to inquire about the status of the loan renewal.  In his e-mail Reeves stated:

> Short of a sizable equity injection, we will not have the liquidity to sustain operations.  If we receive the funds from [the Waco] escrow . . . [w]e can sustain operations and be fully recovered by year end 2010. . . . I need for Colonial to Release the escrow . . . [or] I will be forced to suspend our Dollar General Development Program in order to preserve necessary cash to sustain our local civil and commercial construction operations. . . .
>
> . . . .
>
> . . . . By Tuesday of next week we will no longer have the ability to continue development operations.

(Pl.'s Ex. 79, Doc.  63.)  Susan Bell, Senior Vice President of BB&T's Acquired Assets Group, considered this email to be "written admissions of an extremely material and probably irreversible condition . . . of the financial condition of Houma Dollar." (Bell. Aff. ¶ 16, Pl.'s Mot. Summ. J., Ex. 146, Doc. 63.)  In Bell's [and BB&T's] opinion "that [financial condition] impaired BB&T's security and increased its risk, which was an Event of Default under section 6.01(L) of the Second Amended GLA."  (*Id.*)

This was not the only event of default. The first was the Maypearl Note, which occurred prior to Reeves' March 11th e-mail. The Maypearl note came due in December 2009, as the parties were attempting to negotiate a workout agreement.  Though the Note was mentioned in the negotiations, it was never paid and default was not waived.  The potential funding sources that could be used to satisfy that note were part of the discussions between Reeves and Miles,

and no immediate demand for payment was made.  However, the outstanding balance was never satisfied, and the note remained in default.

On March 24, 2010, Reeves took part in a conference call with Bell and BB&T's attorneys.  During this call, BB&T informed Reeves that it was applying the escrowed Waco funds to the principal balance of the note.  Reeves informed BB&T that no workout agreement would be possible unless the cash from the Waco escrow was released to Houma.  More defaults occurred shortly thereafter--the Austin note came due on March 25, 2010, and the Gary and Hobart loans came due on March 31, 2010.  None were paid.

Negotiations continued.  Reeves made several proposals to save some of the outstanding projects, but BB&T's insistence on a total release from liability was a stumbling block.  By early April, BB&T refused to allow any more loan draws.  On April 26, 2010, BB&T wrote to Houma and the Guarantors to notify them of default and demand payment.  Meanwhile, Houma secured a buyer for its Shallowater store.  On May 3, 2010, BB&T provided a loan payoff amount for the Shallowater property.  That payoff letter stated:  "In the event the entire release price is not received by Lender by the end of business May 10, 2010, this Letter shall expire and Lender's agreement to release the property shall terminate."  (Defs.' Ex. 39, Doc. 63.)  The loan closing was delayed, however, and did not meet the deadline in the payoff letter.  When the title company requested an updated payoff amount, BB&T refused to provide one, and the sale fell through.

Because of the cross-default provisions in all of the Houma notes, BB&T's April 26, 2010 demand letter declared all the outstanding notes to be in default and demanded payment on all.  The total amount of principal due on the notes is $4,606,410.81.  If successful in this lawsuit, BB&T is also entitled to prejudgment interest, which amounts to $1,551,524.61.  Thus,

the total amount of principal and interest due is $6,157,935.42.  BB&T is also entitled to recover attorney's fees and costs.

### J.  The Reeves' Personal Loan

In February 2008, Charles and Suzanne Reeves obtained a loan from Colonial Bank and signed a promissory note in the amount of $421,200.  Along with the note, the Reeves also signed an acknowledgement of balloon payment.  The note was due on March 5, 2010, was not paid, and is in default.  The total amount due, excluding attorney's fees and costs, is $514,937.55, consisting of outstanding principal in the amount of $385,960.63 plus prejudgment interest in the amount of $128,976.92.  The Reeves are also liable for attorney's fees and costs under the terms of the note.

## II.  PROCEDURAL BACKGROUND

On May 21, 2010, BB&T filed the instant action.  The complaint asserts claims against all Defendants for breach of contract based on the default on the Houma Notes and the Guaranty Agreement. It also asserts a breach of contract claim against Charles Reeves and Suzanne Reeves for default on the personal loan.  Defendants responded with an answer and counterclaims for negligent misrepresentation (Count I), breach of loan documents (Count II), breach of the duty of good faith (Count III), wrongful interference with business relationships/failure to fund draw requests (Count IV) and wrongful interference with business relationships/destroying the Shallowater deal (Count V).  BB&T filed a motion to dismiss the counterclaims.  In response, Defendants dismissed Count III.  All remaining claims survived the motion to dismiss.

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The

party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact.  Id.

> Where the moving party also has the burden of proof at trial,
>
> > that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)  (citations and internal quotation marks omitted).  In this case, the BB&T seeks summary judgment on both claims for which it bears the burden of proof at trial (i.e., BB&T's breach of contract claim and claims for which the Defendants bear the burden of proof (i.e., Defendants' counterclaims).

## IV.  ISSUES RAISED

BB&T asserts that it is entitled to summary judgment on its breach of contract claims and on each of the Defendants' counterclaims against it.  In their response, Defendants address some, but not all, of the issues raised by BB&T.  Defendants do not dispute BB&T's ability to prove both breach of contract claims, but they do raise an affirmative defense they claim would defeat summary judgment with respect to the Houma Notes.  Defendants do not address BB&T's factual or legal arguments regarding the misrepresentation counterclaim, but they do oppose summary judgment on the remaining counterclaims.

## V.  LEGAL ANALYSIS

### A.  BB&T's First Breach of Contract Claim: The Houma Notes & Guaranty Agreements

#### 1.  BB&T Has Established a Prima Facie Case

BB&T has presented sufficient evidence to prove its right to recovery under the Houma Notes and the related Guaranty Agreements.  BB&T has proved its breach of contract claim against Houma, the borrower, with evidence demonstrating the existence of the notes, the amounts due, and lack of payment.  *See Griffin v. American Bank*, 628 So. 2d 540, 543 (Ala. 1993).   To obtain recovery from the guarantors, BB&T must prove:  (1) "the existence of the guaranty contract," (2) "default on the underlying contract by the debtor," and (3)  "nonpayment of the amount due from the guarantor under the terms of the guaranty."  *Sharer v. Bend Millwork Sys., Inc.*, 600 So. 2d 223, 225-26 (Ala. 1992) (citation omitted).  Those facts have also been established without dispute.[5]  Thus, BB&T is entitled to summary judgment unless the Defendants can demonstrate the existence of an affirmative defense.

#### 2.  The Equitable Estoppel Defense

Defendants assert that BB&T should be equitably estopped from enforcing the Houma Notes or Guaranty Agreements.  Equitable estoppel is an affirmative defense, the purpose of which "is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience."  *Pierce v. Hand, Arendall, Bedsole Greaves & Johnston, P.C.,* 678 So. 2d 765, 768 (Ala. 1996).  The party asserting an equitable estoppel defense has the burden of proving:

---

[5] Although notice to the guarantor of the debtor's default is generally an element that must be proved to recover on a continuing guaranty agreement, that element can be waived by contract.  *Id.*  The agreement in this case contained a clear waiver of notice of default.

(1) That [t]he person against whom estoppel is asserted, who usually must have knowledge of the facts, communicates something in a misleading way, either by words, conduct, or silence, with the intention that the communication will be acted on;

(2) That the person seeking to assert estoppel, who lacks knowledge of the facts, relies upon [the] communication; and

(3) That the person relying would be harmed materially if the actor is later permitted to assert a claim inconsistent with his earlier conduct.

*BSI Rentals, Inc. v. Wendt*, 893 So. 2d 1184, 1187 (Ala. Civ. App. 2004) (internal quotations omitted).

Defendants contend that three statements or actions by Colonial and/or BB&T misled Houma to believing that the loans would be extended.  Those statements, as set forth by the Defendants, are:

- A March 2009 promise by loan officer Sam Nelson that Colonial would "work with Houma Dollar to complete all Projects then under development."
- Colonial's assurance that once Projects were started, it would fund them in due course to completion.
- BB&T's promise "to work with Houma Dollar to restructure and workout Houma Dollar's loans."

Defs.' Summ. J. Br., Doc. 70, 19.  Houma contends that in reliance on these statements it committed additional capital to Projects and did not seek alternative funding for its Projects. Houma claims it will be materially harmed if it is forced to repay the loans.  For numerous reasons, Defendants' equitable estoppel defense falls short.

### a. The Equitable Estoppel Defense Lacks Evidentiary Support

First, the statements that form the basis of their defense do not actually exist in the record.  Sam Nelson's 2009 promise to "work with Houma to complete all projects then under development" is supported by cites to Reeves' deposition, page 47, and to Exhibit 8, which is a memo from Nelson to the Loan Committee.  Reeves' cited testimony says nothing about any

promise to work with Houma to complete projects.[6]   Defendants' Exhibit 8 is a March 20, 2009

memo from Sam Nelson to the Loan Committee, which states:

> This memo is an addendum to the loan package that went thru OLC on March 17, 2009 for the Houma Dollar Partners, LLC.  I am requesting the maturity for the guidance line renewal to be 9/17/2009; 6 months from the date of the approval.  I am requesting that we allow Houma Dollar to fund the projects in their pipeline with us . . . **providing that they can fund those before September 19, 2009** and providing that there is availability under the line.
>
> If they are not able to fund the projects by that date then the line will cease and no more projects will be funded.  We will work with Houma to get all of their projects sold and paid off as quickly as possible.  It is conceivable that we can be out of this credit completely by the first quarter of 2010 if the attached schedule is correct.

(Defs.' Ex. 8, Doc. 70-7 (emphasis added)).  Nothing in this memo indicates an intention, much

less a promise, to fund any project after September 19, 2009.  Furthermore, this document is an

internal memo, and there is no evidence that its contents were ever communicated to the

---

[6] Reeves actual testimony was as follows:

A     . . . Never did I think that funding would cease at that time and I don't think that the Notes in fact indicate that.  I think that the Guidance Line would simply cease at that time.

Q     . . . So then would it be true between March 20th and April 2nd that you had a discussion with Mr. Fullington and Mr. Nelson in which you learned that they were proposing the six months saying that's what the bank would be willing to do instead of the one year?

A     They [Nelson and Fullington] told me that the bank would be willing to extend the Guidance Line for six months and we would revisit it in six months.  That they could guarantee that they would do a six month guidance line with . . . six stores and we identified six stores.

Q     . . . Are those the six projects you have in mind …?

A     When Sam and Todd called me they said that they had gotten the loan approved and that everything was fine.  And by the way, we got it done for six months.  We can't go a year, but we'll revisit it in six months and we have to limit it to six deals.

Reeves Dep. at 47-48.

Defendants.  Even if the memo indicated an intention to fund projects to completion, it would not provide evidence of a promise made to Houma.

Defendants also lack support for their claim that "Colonial assured Houma Dollar that it . . . would continue to fund [projects underway] in due course until completion."  Again, Defendants' citation to Charles Reeves' deposition testimony is far off base.  Reeves testified:

> A       I was told repeatedly by Sam Nelson and – as we did projects through the years with Colonial Bank, that obviously if we were midway through construction on a project and one of the notes matures, **that reasonable prudence was – or a reasonable standard would be that the lender would renew that promissory note for the period of time to get through the interim construction period.**

Reeves Dep. 204 (emphasis added).  An opinion of reasonable prudence is hardly a promise to act.  Furthermore, Defendants claim to have been misled in this instance not simply by the promise to fund projects, but by the promise to fund them in "due course."  From the context of Defendants' argument, what they mean by "due course" is without delay.  Nowhere could such a promise be gleaned from the testimony cited.

Finally, BB&T's alleged statement "that it would work with Houma to restructure and workout Houma Dollars loans" is another claim spun from whole cloth.  Defendants cite paragraphs 36 and 37 of Reeves' declaration.  In paragraph 36, Reeves states that *he* submitted a "final workout proposal" to Emily Miles on January 13, 2010.  Paragraph 37 states:

> The next day Ms. Miles emailed me listing a number of things that would be required to renew the loans for the proposed workout agreement.  The only thing that would require any time was the reappraisal of the Maypearl site.  In her email, Ms. Miles acknowledged the receipt of the proposed workout request and indicated that she had made a few changes to the document.

Reeves' Decl. ¶ 37.[7]

---

[7] The January 14th e-mail from Emily Miles, referred to in paragraph 37, is attached as an exhibit to the Reeves' declaration.  That e-mail makes no statements or promises about working with Houma to restructure and workout loans.

### b. The Statements Were Not Misleading

The equitable estoppel doctrine is akin to a fraud action in that the Defendants must prove both that the statements they relied on were misleading and that BB&T/Colonial[8] knew the truth to be different.

> The purpose of the equitable estoppel defense is to prevent inconsistency and fraud resulting from injustice. "It rests at last for its vindication on the manifest idea that to allow such representation to be gainsaid would be fraud on him who had thus acted, believing it to be true." The record in this case shows no misrepresentation or deliberate conduct designed to consciously and unfairly mislead [the defendant]. The most that can be said is that [the defendant] and [the plaintiff] conducted negotiations which both parties hoped would eventually result in consummation of a contract. That the negotiations proved unfruitful does not warrant application of equitable estoppel.

*Coley v. Lang*, 339 So. 2d 70, 74-75 (Ala. Civ. App. 1976) (quoting *Cosby v. Moore*, 259 Ala. 41, 47, 65 So. 2d 178, 182 (1953)).

Even if the statements were as Defendants assert, none of them would amount to a "misrepresentation or deliberate conduct designed to consciously and unfairly mislead" the Defendants. There is no evidence that in March 2009 Colonial did not intend to "work with Houma Dollar to complete all Projects then under development." It did, in fact, renew several loans for projects under development after March 2009. The phrase "work with" does not necessarily contemplate that the outcome will be successful or that projects will necessarily be funded. Likewise, BB&T's purported promise to "work with" Houma to restructure and renew loans was not a representation of any particular outcome. As Defendants' own evidence demonstrates, Miles did "work with" Reeves on the loan renewals but the result was not

---

[8] The term "BB&T/Colonial" is used when actions over time involved both BB&T <u>and</u> Colonial.

favorable.[9]  Finally, Colonial's purported statement that it would fund projects "in due course" does not imply, as Defendants would infer, that Colonial (or BB&T) was obliged to renew loans quickly or without delay.  In sum, Defendants have failed to prove that the misrepresentations asserted were intended to deliberately mislead them.

### c.  The Equitable Estoppel Defense Violates the Statute of Frauds

Each of Defendants' equitable estoppel claims relies on an oral agreement that fall within Alabama's statute of frauds.  Alabama Code, § 8-9-2 (1975) requires that [e]very agreement or commitment to lend money, delay or forebear repayment thereof or to modify the provisions of such an agreement or commitment except for consumer loans with a principal amount financed less than $25,000" be in a writing which states consideration and is signed by the party against whom the agreement is to be enforced.  In this instance, each statement—whether it relates to funding projects, funding projects "in due course" or restructuring and renewing loans—involves "an agreement to lend money, to forebear repayment of money or to modify an agreement to lend money" in an amount exceeding $25,000.  Consequently, Defendants' equitable estoppel defense is precluded by the statute of frauds.  *Cf. Southland Bank v. A&A Drywall Supply Co., Inc.* 21 So. 3d 1196, 1220 (Ala. 2008) (rejecting tort claims for negligence and wantonness because claims relied on oral contract to lend money which violated statute of frauds).

### d.  The Equitable Estoppel Defense is Foreclosed by Terms of the Contract

The Second Amended GLA contains specific provisions that defeat Defendants' equitable estoppel defense.  First, the agreement could not "be modified or amended except by a

---

[9] Furthermore, the undisputed evidence shows that it was Reeves' own actions that ended Miles' work on the loan renewals.  When Reeves sent an email in March 2010 stating that Houma would have to cease operations unless the escrowed Waco funds were released, the BB&T considered the Houma account to be in serious trouble and took it out of Miles' hands.

*written* agreement executed by the Borrower and Lender." (Second Am. GLA § 8.09.) Also, "[n]o modification amendment or waiver of any provision of this Agreement, the Note or other Loan Documents nor consent to any departure therefrom by the Borrower shall be effective unless the same shall be in writing and signed by the Lender." (*Id.* § 8.06.) Furthermore, "[n]either any failure nor any delay on the part of [the] Lender in exercising any right" under the Agreement, any Note or other loan documents, nor any course of dealing between the parties … shall operate as a waiver thereof." (*Id.* § 8.05.) Equitable estoppel will not defeat a breach of contract claim where, as here, the claim is based on an oral representation or course of dealings and the contract contains a non-waiver provision *and* requires that all modifications be in writing. *Bass v. Southtrust Bank*, 538 So. 2d 794, 799 (Ala. 1989).

   **3. Conclusion**

   There is no dispute that Houma is in default on all the Houma Notes. Its attempts to avoid payment by invoking equitable estoppel are to no avail. Therefore, Houma is liable to BB&T for the amounts due and owing on those notes. Likewise, the Guarantors are jointly and severally liable with Houma. BB&T is entitled to summary judgment against these defendants on its breach of contract claim.

   **B. BB&T's Second Breach of Contract Claim:  The Reeves' Personal Loan**

   Charles and Suzanne Reeves have asserted no defense to the breach of contract claim based on the default on their individual loan. BB&T has proved its breach of contract claim against the Reeves with evidence demonstrating the existence of the note, the amounts due, and lack of payment. *See Griffin v. American Bank*, 68 So. 2d 540, 543 (Ala. 1993). Accordingly, BB&T is also entitled to summary judgment on this count.

**C. Defendants' First Counterclaim:  Negligent Misrepresentation**

The Defendants appear to have abandoned their counterclaim for negligent misrepresentation, and for good reason.  BB&T points out numerous deficiencies in the Defendants' misrepresentation claim.  The Court need not address all of the issues raised by BB&T because one alone—the *D'Oench, Duhme* doctrine—is sufficient to defeat Defendants' counterclaim.  In *D'Oench, Duhme& Co., Inc. v. FDIC,* 315 U.S. 447 (1942), the Supreme Court held that an unwritten agreement between a bank and a private party cannot be enforced against the FDIC.  As insurer of a bank's deposits, the FDIC is not liable for "'any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records.'"  *Murphy v. FDIC*, 208 F.3d 959, 963 (11ᵗʰ Cir. 2000) (quoting *Baumann v. Savers Fed. Sav. & Loan Ass'n*, 934 F.2d 1506, 1515 (11ᵗʰ Cir. 1991)).  *D'Oench, Duhme* also applies to the FDIC's successors.  *First Union Nat. Bank of Florida v. Hall*, 123 F.3d 1374, 1376 (11ᵗʰ Cir. 1997).

Defendants' negligent misrepresentation claim arises from a statement made by Colonial Bank representative Sam Nelson to Reeves in January 2009  Reeves allegedly told Nelson that Colonial's management had stated that they had multiple sources from which to raise the capital Colonial needed.  Reeves apparently took this to mean that Colonial's financial position was sound and did not seek alternative sources of funding.[10]  This oral representation is not actionable under *D'Oench, Duhme*.  *See Murphy*, 208 F.3d at 963 (plaintiff's fraud and misrepresentation claims, *inter alia*, against FDIC barred by *D'Oench, Duhme*).  Accordingly,

---

[10] Because the Defendants did not address negligent misrepresentation in their summary judgment response, the Court can only surmise the facts that may have given rise to the claim. This counterclaim was addressed, in part, in the order on BB&T's motion to dismiss.  At that time, Defendants had, in effect, abandoned all allegations of misrepresentation claims *except* the one set forth above.

BB&T is entitled to summary judgment on Defendants' counterclaim for negligent misrepresentation.

### D.  Defendants' Second Counterclaim:  Breach of Loan Documents

Defendants assert that BB&T is liable to them under a breach of contract theory because BB&T/Colonial breached the loan documents.  The elements of a breach of contract claim are well-established.  The party asserting a breach of contract must prove: "'(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the opposing party's nonperformance, and (4) damages.'"  *Employee's Benefit Assoc. v. Grissett*, 732 So. 2d 968, 975 (Ala. 1998) (quoting *Southern Medical Health Systems, Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995)).  In their Answer and Counterclaim, Defendants described the breach as the bank's "failure to fund draw requests."  BB&T has presented evidence that all draw requests were processed and paid in a timely manner.  BB&T/Colonial advanced to Houma as much of the requested amount as was supported by the documents.  Some requests were partially rejected based on independent inspections and in compliance with the loan documents.

In the face of BB&T's evidence that all draw requests were honored (or, partially rejected) in a timely manner and in accordance with the terms of the agreement, Defendants respond with a brand new claim. Specifically, Defendants argue:

> In this case, the parties' agreement consisted of the Guidance Line, the Master [Construction Loan] Advance Agreement [MCLAA], and the individual Notes on the various Projects.  The [MCLAA] required COLONIAL/BB&T to make advances in response to draw requests for the Projects if certain written criteria were met by Houma in making the request. . . .  BB&T's reliance [on evidence that all draw requests submitted . . . . were timely funded] is misplaced because Houma Dollar did not forward draw requests until it knew that all the requirements for funding were met. *The issues were created by delays in booking loans for the various Projects. . . . Simply stated Houma Dollar was well aware of the rules for draw payment, and if the Bank had not yet put a loan into a position in which draws could be funded from it, Houma Dollar did not go through the motion of making a formal draw request.*

Defs.' Summ. J. Br., 23-24, Doc. 70 (citations omitted, emphasis added).

Put simply, Defendants have no evidence that BB&T/Colonial breached the provisions of the loan documents by failing to fund draw requests that were actually submitted. Instead, they claim that BB&T should be held liable for failing to fund draw requests that were *not* submitted. That is nonsense. Defendants imply that BB&T is liable for wrongdoing because of "delays in booking the loans."[11] That, however, cannot support a breach of contract claim because there is no contractual requirement that loans be renewed without delay or even within a specific timeframe. In fact, the loan documents specifically stated, in numerous places, that BB&T/Colonial had no obligation to renew any loan. In sum, BB&T did not breach its duty under the contract by failing to fund draw requests that were never submitted. That the draw requests were not submitted due to delayed loan renewals is of no moment because BB&T/Colonial had no obligation to renew the loans in a timely manner, or even to renew the loans at all.

### E. Defendants' Third Counterclaim: Intentional Interference with Business Relationships

Defendants actually assert two claims for intentional interference with business relationships. The first is based on BB&T's alleged failure to honor draw requests which, for reasons discussed immediately above, lacks evidentiary support. That leaves only one intentional interference counterclaim—based on BB&T's refusal to provide a payoff amount for the Shallowater property which led to the collapse of potential sale of that property to a third party. To prevail on a claim for intentional interference with business relationships, Defendants must prove: " (1) the existence of a protectible [sic] business relationship; (2) of which the

---

[11] Defendants do not explain what they mean by the term "booking" a loan. The Court presumes, from the context, that it refers to the loan renewal process.

defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Group, L.L.C. v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009) (*White Sands II*).  BB&T argues that it is not liable because mere "refusal to deal" does not amount to intentional interference, *see e.g,. Bear Creek Enterprises, Inc. v. Warrior & Gulf Navigation Co., Inc.*, 529 So. 2d 959 (Ala. 1988), and also because its conduct was justified.[12]  The Court agrees that the facts of this case do not support an intentional interference claim, although not necessarily for the reasons asserted by BB&T.

### 1. Assertion of a Contractual Right Is Not Intentional Interference

The Alabama Supreme Court has held that "the tort of intentional interference with business relations was intended to provide a remedy for situations where a third party intentionally interferes with the relationship of two contracting parties, not as a remedy for situations where an allegedly breached contract between two parties. . . affects the relationship of one of the parties with a third party." *Cahaba Seafood, Inc. v. Central Bank of the South, Inc.*, 567 So. 2d 1304, 1306 (Ala. 1990).  *Cahaba* involved a line of credit between the plaintiffs and the defendant bank.  The parties' written agreement provided for a $25,000 line of credit and also stated that the bank "would advance up to 80 percent of accounts receivable of the business." *Id.*  The bank's interpretation was that the 80 percent figure was subject to the $25,000 cap on the line of credit, and refused to extend credit beyond $25,000.  The plaintiffs contended that the agreement called for a line of credit in the amount of $25,000 *plus* an amount equal to 80 percent of the accounts receivable.  The plaintiffs filed suit for breach of contract <u>and</u> for intentional interference with business relationships.  With respect to the latter claim, the plaintiffs asserted

---

[12] Justification is an affirmative defense to a claim of intentional interference.  *White Sands II*, 32 So. 3d at 13.

that bank's actions affected their relationship with one of their customers, the Wynfrey Hotel.

The Alabama Supreme Court rejected the intentional interference claim, holding:

> In the case at bar, there is a dispute over the proper interpretation of the contract between Central Bank and the plaintiffs. The plaintiffs'' intentional interference claim involves an alleged breach of contract on the part of the Central Bank *that happened to affect* their relationship with the Wynfrey Hotel. The tort of intentional interference with business relationships was intended to provide a remedy for situations where a third party intentionally interferes with the relationship of two contracting parties, not as a remedy for situations where an allegedly breached contract between two parties (here the plaintiffs and Central Bank) affects the relationship of one of the parties with a third party.

*Id.* at 1306.

In the instant case the argument against an intentional interference claim is even more compelling. The *Cahaba* plaintiffs based their intentional interference claim on an alleged breach of contract, i.e., a wrongful act. Defendants' claim arises from BB&T's *lawful* exercise of its rights under the contract. BB&T had the right to maintain a lien on the Shallowater property and therefore was *not* obligated to provide a payoff amount for the Shallowater sale.[13] If breach of contract does not give rise to a claim for intentional interference with business relationships, a fortiori, the lawful exercise of a contractual right does not.

### 2. BB&T Was Not a Stranger to Houma's Agreement to Sell Collateral

The Eleventh Circuit's decision in *MAC East, LLC v. Shoney's*, 535 F.3d 1293 (11th Cir. 2008), provides a different, yet equally viable, basis for rejecting Defendants' intentional interference claim. That case involved a dispute between two parties to a lease agreement. Shoney's, the lessor, refused to give permission to MAC East, the lessee, to sublease the leased property to a third party. Under the lease agreement, Shoney's retained the right to approve any

---

[13] The Second Amended GLA, as well as the Houma Notes, contained cross-default and cross-collateralization provisions.

sublease.  MAC East filed suit against Shoney's asserting several claims, including one for intentional interference with business relationships.  The Eleventh Circuit rejected this claim for several reasons, one of which was the contractual relationship between the parties.  As noted, one of the elements of an intentional interference claim is that the party against whom the claim is asserted must be a "stranger" to the relationship with which he allegedly interfered.  Alabama law defines "stranger" in the negative, that is, "a defendant is not a stranger when . . . 'both the defendant and the plaintiff are parties to a comprehensive interwoven set of contract or relations.'"  *Id.* at 1297 (quoting *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1156 (Ala. 2003)).[14]  The Eleventh Circuit held Shoney's was not a stranger to the relationship between MAC East and the potential sublessee because both Shoney's and MAC East were parties to the lease, "the terms of which affect MAC East's ability to sublease the premises.  Therefore, they 'are parties to a comprehensive interwoven set of contract or [sic] relations.'"  *MAC East*, 535 F.3d at 1298 (internal quotation marks omitted).

The Shallowater property was collateral securing all Houma Notes.  Just as Shoney's had the contractual right to control aspects of the sublease, BB&T had the contractual right to place a lien on any Property subject to the Second Amended GLA and Houma Notes.  BB&T was not a "stranger" to the relationship between Houma and the potential Shallowater buyer because Houma was attempting to sell property in which Houma, by contract, had a legal interest.  For that reasons, also, there can be no cause of action for intentional interference.

---

[14] There are other alternative definitions of a "non-stranger", *see id.*, none of which are relevant here.

**V.  CONCLUSION**

For the reasons set forth above, the Court finds that the Plaintiff, BB&T, is entitled to summary judgment on its claims against all Defendants and is also entitled to summary judgment on Defendants' counterclaims against it.  Accordingly it is **ORDERED** that the motion for summary judgment be and hereby is **GRANTED**.  Judgment will be entered by separate order.

**DONE** and **ORDERED** this the 6th day of February, 2012.


s/*Charles R. Butler, Jr.*
**Senior United States District Judge**